

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-7-2002

# Concepcion v. Morton

Precedential or Non-Precedential: Precedential

Docket No. 01-4345

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Concepcion v. Morton" (2002). *2002 Decisions.* Paper 636.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/636

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 7, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4345

VICTOR CONCEPCION; ANTHONY WAYS;
RICHARD HARRINGTON

v.

WILLIS MORTON, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS THE ADMINISTRATOR OF NEW JERSEY
STATE PRISON; ROBERT SMITH, 1-25, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITY AS EMPLOYEES AT
N.J.S.P. (FICTITIOUS NAMES ACTUAL NAMES
PRESENTLY UNKNOWN); JOHN CELLNOW, CORRECTION
OFFICER; JOHN PHILLIPS, CORRECTION OFFICER
(FICTITIOUS NAMES, FIRST NAMES PRESENTLY
UNKNOWN), INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A CORRECTION OFFICER AT THE NEW
JERSEY STATE PRISON; ROBERT COLE, SERGEANT;
JOHN DOLBY, SERGEANT; JOHN ALEIMO, SERGEANT;
JOHN RICHTER, CORRECTIONS OFFICER; JOHN
GORMAN, CORRECTIONS OFFICER; JOHN SMITH, 1-15
(FICTITIOUS NAMES OF CORRECTIONS OFFICERS AND
ADMINISTRATORS OF OTHER SUPERVISORY
PERSONNEL AT THE NEW JERSEY STATE PRISON,
NAMES CURRENTLY UNKNOWN)

Larry Cole, George Phillips, James Gorman and
Robert Richter,

          Appellants

On Appeal from the United States District Court
for the District of New Jersey

Magistrate Judge: The Honorable Freda L. Wolfson
(No. 98-cv-03681)

Argued on July 19, 2002

Before: McKEE, FUENTES, and ALDISERT, Circuit  Judges.

(Opinion Filed: October 7, 2002)

          DAVID SAMSON
          Attorney General of New Jersey

          LORI E. GRIFA (Argued)
          Deputy Attorney General

          PATRICK DeALMEDIA

Deputy Attorney General
Of Counsel

DAVID M. RAGONESE
Deputy Attorney General
On the Brief

R.J. Hughes Justice Complex
P.O. Box 112
25 Market Street
Trenton, NJ 08625

 Counsel for Appellants

PAUL J. HIRSH (Argued)
Paul J. Hirsh, P.C.
4 Campus Drive, 1S, P.O. Box 5534
Parsippany, NJ 07054

RODNEY D. RAY
525 Route 73 South
Evesham Commons, Suite 200
Marlton, NJ 08053

 Counsel for Appellees

2

OPINION OF THE COURT

FUENTES, Circuit Judge:

The Prison Litigation Reform Act of 1995 (PLRA), 110
Stat. 1321-73, as amended, 42 U.S.C. S 1997e(a), provides
that a prisoner confined in any jail, prison or correctional
facility may not bring any action under any federal law --
with respect to prison conditions -- "until such
administrative remedies as are available are exhausted."
The issue in this case is whether the PLRA's exhaustion
requirement applies to a grievance procedure described in
an inmate handbook but not formally adopted by a state
administrative agency. We hold that it does. Accordingly,
we reverse the judgment of the District Court and we
remand the case for further proceedings consistent with
this opinion.

I.

Plaintiffs Victor Concepcion and Anthony Ways are
inmates in the custody of the New Jersey Department of
Corrections (NJDOC). They filed this S 1983 action against
various corrections officers and officials on August 6, 1998,
alleging that the defendants violated their civil rights
through the use of excessive force during two separate
incidents on August 18, 1997. We briefly describe each of
these alleged incidents in turn.

A. Concepcion Incident

During the morning of August 18, 1997, Corrections Officer William Sellnow opened all of the cells in Concepcion's tier at the New Jersey State Prison (NJSP) so that the inmates could proceed to morning breakfast. After opening the cells, Sellnow walked down the hallway and crossed paths with Concepcion. Because the hall was narrow, Concepcion claims that he had to turn to the side so that Sellnow could pass. According to Concepcion, for no apparent reason, Sellnow rammed his shoulder into Concepcion's left shoulder as he walked by, and

Concepcion responded by asking, "What's your problem?" App. at A112-13. Concepcion claims that the two men then started swinging at each other simultaneously.

According to Concepcion, he and Sellnow exchanged punches for only a "couple [of] seconds." Id. at A114. Concepcion admits that he hit Sellnow, who later received at least four stitches in the forehead. Upon witnessing the fray from a nearby desk, Sergeant Larry Cole called a "Code 33," which, according to Concepcion, "means there's a fight." Id. at A115. At this point, Concepcion claims that approximately thirty to forty officers began running towards him. In response, Concepcion ran in the opposite direction and jumped over the tier railing down to the first floor.

Several officers caught and restrained Concepcion on the first floor. Corrections Officer George Phillips testified that it took four or five officers to place Concepcion in handcuffs. While restraining Concepcion, Phillips suffered a burn from a nearby boiler pipe. After he was restrained, Concepcion claims that Cole kicked him in the face and that Phillips stuck his nightstick in between Concepcion's handcuffs, lifting him off his feet and into the air. Concepcion further claims that Phillips rammed his head into a cement wall, and that after Concepcion was taken to a detention cell, Phillips hit him in the forehead with a nightstick.

As a result of the events described above, Concepcion was charged with committing a prohibited act ("assaulting any person") in violation of Title 10A of the New Jersey Administrative Code, which subjects inmates to disciplinary action and sanctions for committing certain enumerated acts. See N.J. ADMIN. CODE  tit. 10A, S 4-4.1(a)*.002 (2002). After a disciplinary hearing, the hearing officer found Concepcion guilty as charged and sanctioned him to 15 days detention, a 360-day loss of commutation time, and 365 days administrative segregation.

B. Ways Incident

On August 18, 1997, the same day in which the above events took place, inmate Anthony Ways was involved in a separate incident. After having his lunch at the prison

cafeteria, Ways proceeded towards a central rotunda, upon which various wings of the prison converge. He alleges that, as he approached the rotunda, there was a "commotion going on," with "people . . . running" and"officers swinging sticks." App. at A135. He also testified that he saw two officers on the ground in the center of the rotunda.

After observing this commotion, Ways claims that he attempted to get back to his wing so that he could return to his cell. Id. at A137. According to Ways, while attempting to return, he was approached by Corrections Officer Robert Richter. Ways testified as follows:

> [H]e's approaching me, so, out of instinct, my hands go up. He swings. As he swings, I'm trying to prevent his swing by pushing his shoulder away from me. . . . As he swings, he hits me in my jaw, and it didn't knock me out, but it was enough for me. I laid on the ground and surrender[ed].

Id. at A139. According to Ways, after he laid down on the ground, Richter and another officer placed his arms and legs in handcuffs. Ways claims that, after he was restrained, several officers stood him up and carried him towards another wing of the prison. As he was being carried, Ways alleges that he was dropped to the floor and that Richter kicked him. He testified that he sustained various injuries requiring medical treatment.

In connection with the events of that day, Ways was charged with assaulting Richter and two other corrections officers in violation of Title 10A of the New Jersey Administrative Code. See N.J. ADMIN. CODE tit. 10A, S 4-4.1(a)*.002 (2002). After a disciplinary hearing, a hearing officer found Ways guilty on all charges and sanctioned him to 30 days detention, a 970-day loss of commutation time, 970 days administrative segregation, and a 30-day loss of recreation privileges. On February 19, 1999, also in connection with what transpired on August 18, 1997, Ways pled guilty to criminal aggravated assault in violation of N.J. STAT. ANN. S 2C:12-1(b)(5). The aggravated assault charge was based on the fact that Ways had punched Corrections Officer Kimberly Bleinstein in the face, breaking her jaw.

C. Plaintiffs' S 1983 Complaint

On August 6, 1998, Concepcion and Ways filed their complaint pursuant to 42 U.S.C. S 1983, alleging that they were the victims of excessive force in violation of their constitutional rights on August 18, 1997. They named seven NJSP corrections officers and officials as defendants.

On August 22, 2000, the defendants moved for summary judgment, arguing, inter alia, that the plaintiffs had failed

to exhaust available administrative remedies pursuant to 42 U.S.C. S 1997e(a), which mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner . . . until such administrative remedies as are available are exhausted." More specifically, the defendants argued that, before seeking redress in a federal court, the plaintiffs were required under S 1997e(a) to follow the administrative grievance procedure set forth in the Department of Corrections Inmate Handbook ("Handbook"). The District Court described that procedure as follows:

> The process begins by the inmate submitting an "Administrative Remedy Form" to the Administrator's Office. Upon receipt, the Department Head writes a response on the form; this response is signed by the Primary Level Supervisor and the Department Head; and the response is finally reviewed and signed by the Intermediate Level Supervisor as the Administrator's designee. The inmate complaint form with the administrative response is then placed in the inmate's Classification folder and the prisoner is given a copy. No administrative appeal is permitted.

Concepcion v. Morton, 125 F. Supp. 2d 111, 116 (D.N.J. 2000) (citations omitted). The Handbook states that the grievance procedure is "set up to give the inmate population a way to bring complaints, problems, suggestions, etc. to the attention of the Administration of New Jersey State Prison to solve or possibly put into use." App. at A5.

Finding that the grievance procedure described in the Handbook does not constitute an "administrative remedy" for purposes of S 1997e(a), the District Court held that there were no available administrative remedies for the

6

plaintiffs to exhaust and therefore denied defendants' motion to dismiss the complaint for failure to address available administrative remedies on December 21, 2000.1 Concepcion, 125 F. Supp. 2d at 121. After conducting an analysis of the language, structure, and legislative history of S 1997e(a), the court concluded that, in using the phrase "administrative remedies," Congress meant "administrative schemes promulgated by an agency." Id. at 120. Because the prison warden and his staff, rather than the Department of Corrections, promulgated the grievance procedure in the Handbook, the District Court held that the remedy was not "administrative" in nature and thus outside the scope of S 1997e(a). See id.

Subsequent to the District Court's decision denying summary judgment, the United States Supreme Court decided Booth v. Churner, 532 U.S. 731 (2001), in which the Court held that S 1997e(a) requires exhaustion of an administrative remedy even if that remedy cannot grant the type of relief sought by an inmate. See id. at 734. Thus, the prisoner in that case, who sought only money damages

under S 1983, was required to complete a prison administrative process, even though that process could not provide him with any monetary relief. See id. On June 11, 2001, in light of the Court's holding in Booth , the defendants moved for reconsideration of the District Court's decision. The District Court, however, denied defendants' motion for reconsideration, explaining:

> The clear implication of Booth is that courts should not read futility exceptions into [S 1997e(a)'s] exhaustion requirement where there is an existing administrative procedure. Here, this Court found that there was no existing administrative procedure; therefore; the

---

1. The District Court did, however, grant summary judgment on Count Seven of plaintiffs' amended complaint, which alleged that "defendants Willis Morton and John Smith 1-13 failed to provide adequate training and supervision to their corrections officers in violation of plaintiffs' Fifth, Eighth, and Fourteenth Amendment rights." Concepcion, 125 F. Supp. 2d at 127. The court held that these claims for supervisory liability had to be dismissed because there was no"affirmative link" between the alleged constitutional violations and the officials sued. Id. at 128.

7

> teaching of Booth does not alter the Court's original Opinion and Order.

App. at A28.

The defendants subsequently moved for reconsideration of the District Court's order denying their previous motion for reconsideration, noting that several District Judges in the District of New Jersey had recently issued decisions at odds with the District Court's holding in Concepcion. See, e.g. In re Bayside Prison Litigation, 190 F. Supp. 2d 755, 771 (D.N.J. 2002) ("I cannot accept Concepcion's conclusion that an inmate handbook can never constitute an administrative remedy . . . ."). In the alternative, the defendants sought a stay of the proceedings and moved to certify the question of what constitutes an "administrative remedy" under S 1997e(a). On October 5, 2001, the District Court denied defendants' second motion for reconsideration but granted their motion for certification and for a stay of the proceedings.

The defendants then petitioned this Court, pursuant to Rule 5 of the Federal Rules of Appellate Procedure, for permission to appeal the question whether the exhaustion requirement of S 1997e(a) is applicable only in those instances in which an administrative remedy scheme is adopted through regulations rather than through publication and distribution of an inmate handbook. We granted the petition on November 8, 2001.

II.

The District Court had jurisdiction under 28 U.S.C.
SS 1331 and 1343. We have jurisdiction over this
interlocutory appeal under 28 U.S.C. S 1292(b). Because we
have been asked to consider the scope of S 1997e(a)'s
applicability, which is a question of law, our review is
plenary. See Scully v. US WATS, Inc., 238 F.3d 497, 507 (3d
Cir. 2001); Jenkins v. Morton, 148 F.3d 257, 259 (3d Cir.
1998).

III.

This appeal requires us to consider whether the term
"administrative remedies" in 42 U.S.C. S 1997e(a)

encompasses remedies not promulgated by an
administrative agency, such as the relatively informal
grievance procedure at issue in this case, a procedure
which was established by the prison administrators of the
NJSP and published in the Department of Corrections
Inmate Handbook.

To assert an action under 42 U.S.C. S 1983, plaintiffs
ordinarily need not exhaust administrative remedies first.
Porter v. Nussle, 534 U.S. 516, ___, 122 S.Ct. 983, 987
(2002) (citing Patsy v. Board of Regents of Fla. , 457 U.S.
496, 516 (1982)). However, in 1980, Congress enacted the
Civil Rights of Institutionalized Persons Act (CRIPA), 94
Stat. 352, as amended 42 U.S.C. S 1997e (1994 ed.), which
changed the rules for prisoner suits. CRIPA gave district
courts discretion to stay a prisoner's S 1983 action "for a
period not to exceed 180 days," during which time the
prisoner would exhaust available "plain, speedy, and
effective administrative remedies." S 1997e(a)(1). The
Supreme Court described this provision as a "limited
exhaustion requirement," McCarthy v. Madigan , 503 U.S.
140, 150 (1992), as it "could be ordered only if the State's
prison grievance system met specified federal standards,
and even then, only if, in the particular case, the court
believed the requirement 'appropriate and in the interests of
justice,' " Porter, 534 U.S at ___, 122 S.Ct. at 987-88 (citing
SS 1997e(a) and (b)).

Fifteen years after CRIPA became law, Congress
strengthened its exhaustion requirement by enacting the
Prison Litigation Reform Act of 1995 (PLRA), 110 Stat.
1321-73, as amended, 42 U.S.C. S 1997e(a) (1994 ed.,
Supp. V), which made exhaustion mandatory. The revised
provision states that "[n]o action shall be brought with
respect to prison conditions under section 1983 of this title,
or any other Federal law, by a prisoner confined in any jail,
prison, or other correctional facility until such
administrative remedies as are available are exhausted." 42
U.S.C. S 1997e(a) (emphasis added). At issue in this case is
whether the Handbook's grievance procedure constitutes an
available "administrative remedy" within the scope of the
revised S 1997e(a).

In construing the intended meaning of a statute, we begin with an examination of its language. See Duncan v. Walker, 533 U.S. 167, 172 (2001). Because Congress did not define the term "administrative remedy" inS 1997e(a), we give those words their ordinary meaning. See Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) (citing FDIC v. Meyer, 510 U.S. 471, 476 (1994)). In applying this interpretative principle, the District Court noted that Black's Law Dictionary defines "administrative remedy" to be " 'a nonjudicial remedy provided by an administrative agency.' " Concepcion, 125 F. Supp. 2d at 118 (quoting BLACK'S LAW DICTIONARY 1296 (7th ed. 1999)). Based largely upon this isolated definition in Black's Law Dictionary, as well as a reference in S 1997e(b) to "[t]he failure of a State to adopt or adhere to an administrative grievance procedure," the District Court found that the statute's language indicates that "Congress intended 'administrative remedy' to refer to an administrative scheme adopted by the state department of corrections." Concepcion , 125 F. Supp. 2d at 118-19.

While we recognize that the District Court properly attempted to ascertain the meaning of S 1997e(a) through examination of the statute's own language, we have doubts as to whether that language sufficiently supports the leap the court took in interpreting the general term used by Congress--administrative remedies--as including only the relatively narrow category of remedies ultimately carved out by the District Court, i.e., those that have been"adopted by the state department of corrections." Nowhere inS 1997e does Congress indicate that the manner in which a remedy is implemented affects the applicability of the statute's exhaustion requirement.

Furthermore, we find that the isolated definition of "administrative remedy" cited by the District Court hardly lends conclusive support to its narrow interpretation, which rests mostly on the fact that Congress used the term "administrative remedies" rather than just the term "remedies." The degree to which the word "administrative" should be read to narrow the range of "remedies" contemplated in S 1997e(a), however, appears less certain in light of broader definitions not discussed by the District

Court. For example, another reference defines "administrative" as "proceeding from . . . an administration," which, in turn, is defined as"a body of persons who are responsible for managing a business or an institution." WEBSTER'STHIRD NEW INTERNATIONAL DICTIONARY 28 (1993). In this case, the remedy in the Handbook "proceeded from" the prison warden and his staff, who, as a group responsible for managing the prison, comfortably fit within the above-quoted definition of "administration."

Just as the Supreme Court found that the single word "remedy" in S 1997e(a) can have different meanings "depending on where one looks," Booth, 532 U.S. at 738, we find that the ordinary meaning of the term "administrative remedy" is far less clear and instructive than has been suggested by the District Court. Accordingly, we look to the statutory history and motivating policies of S 1997e(a) for further guidance in determining whether the Handbook's grievance procedure constitutes an "administrative remedy" for purposes of the PLRA's exhaustion requirement.

Plaintiffs liken the grievance procedure described in the Handbook to a "suggestion box," contending that such a remedy is not of the type contemplated by Congress in S 1997e(a). However, as we noted in Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000), " '[t]he removal of the qualifiers "plain, speedy, and effective" from the PLRA's mandatory exhaustion requirement indicates that Congress no longer wanted courts to examine the effectiveness of administrative remedies but rather to focus solely on whether an administrative remedy program is "available" in the prison involved.' " Id. at 72 (quoting Alexander v. Hawk, 159 F.3d 1321, 1326 (11th Cir. 1998)). We further explained that it was a "justifiable assumption" that "Congress intended to save courts from spending countless hours, educating themselves in every case, as to the vagaries of prison administrative processes, state or federal." Nyhuis, 204 F.3d at 74. Along these lines, we think it also justified to assume from the PLRA amendments that Congress did not intend for courts to expend scarce judicial resources examining how and by whom a prison's grievance procedure was implemented. Rather, as noted above, the revisions to S 1997e(a) suggest

11

that Congress wanted the focus to be on the availability of an administrative remedy program. See id. at 72; see also Porter, 534 U.S. at ___, 122 S.Ct. at 988 (explaining that, under S 1997e(a)'s revised exhaustion provision, "[a]ll 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective' "). In this case, while the effectiveness of the Handbook's grievance procedure may be unclear, there is no doubt that it is "available" to the plaintiffs.

The District Court's narrow interpretation of the term "administrative remedies" also seems inconsistent with several other motivating policies and goals of the PLRA. In Porter, a case in which the Supreme Court concluded that the PLRA's exhaustion requirement applies to all inmate suits about prison life, including those involving allegations of excessive force, the Court found that, "[b]eyond doubt, Congress enacted S 1997e(a) to reduce the quantity and improve the quality of prisoner suits." Id. at 988; see also Alexander, 159 F.3d at 1326 n.11 (stating that "Congress amended section 1997e(a) largely in response to concerns about the heavy volume of frivolous prison litigation in the federal courts") (citing 141 Cong. Rec. H14078-02, *H14105

(daily ed. Dec. 6, 1995)).

In Booth, the Court noted some of the practical arguments for exhaustion, even when the administrative remedy cannot provide the type of relief sought by an inmate:

> [R]equiring exhaustion in these circumstances would produce administrative results that would satisfy at least some inmates who start out asking for nothing but money, since the very fact of being heard and prompting administrative change can mollify passions even when nothing ends up in the pocket. And one may suppose that the administrative process itself would filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the courtroom, even absent formal factfinding.

532 U.S. at 737. The fact that the grievance procedure at issue in this case was not formally adopted by the Department of Corrections seems irrelevant to these

rationales for exhaustion. Not only does the process outlined in the Handbook give inmates the opportunity to inform the prison administration about any complaints, but it also provides for a written response back to the inmates. Furthermore, the responses of the Department Head are subject to review by the Administrator's Office and must be signed both by the Department Head and by the Primary Level Supervisor before the Intermediate Level Supervisor gives a final formal answer. (App. at A5.) In light of the forum and feedback provided by the Handbook's remedy, even if the vast majority of prisoners still remain unsatisfied, "at least some" may be able to resolve their concerns without resorting to litigation. For cases ultimately brought to court, the remedy form submitted by the inmate and the written response provided by the prison administration could facilitate adjudication by clarifying the contours of the controversy. See Porter, 122 S.Ct. at 988; see also Nyhuis, 204 F.3d at 74 (noting that an administrative remedy program " 'often helps focus and clarify the issues for the court' ") (quoting Alexander, 159 F.3d at 1326 n.11).

Another policy consideration in favor of the exhaustion requirements relates to the overall efficacy, as well as the improvement, of the administrative process. See Nyhuis, 204 at 76 (stating that "a comprehensive exhaustion requirement better serves the policy of granting an agency the 'opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court' ") (quoting McCarthy, 503 U.S. at 145). Furthermore, if an "inmate sees his meritorious claims handled with care by his jailers, he is more likely to respect their rules and serve his time in a manner that is as productive as possible." Nyhuis, 204 F.3d at 76-77. We find these goals to be consistent with requiring the plaintiffs in this case to

comply with the remedy described in the Handbook before
allowing them to pursue their S 1983 claims in federal
court. If the administrators of the NJSP at least have the
opportunity to consider and address the grievances of
Concepcion and Ways, the possibility exists that the prison
and its administration may benefit or improve. With these
policies in mind, the fact that the Handbook's remedy has

13

not been formally adopted by the NJDOC is without
significance.

IV.

For the reasons stated above, we hold that a remedy need
not be formally adopted through regulations by an agency
in order for it to be considered an "administrative remedy"
within the scope of S 1997e(a)'s exhaustion requirement.
Thus, in this case, the plaintiffs must first attempt to
address their grievances through the administrative remedy
described in New Jersey's Department of Corrections
Inmate Handbook before they will be allowed to pursue
their S 1983 claims. Accordingly, we will reverse the
decision of the District Court and direct it to dismiss the
plaintiffs' complaint for failure to exhaust administrative
remedies pursuant to S 1997e(a).

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

14